## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| TAIREESE REMBERT, Derivatively on Behalf of Nominal Defendant DIGITAL TURBINE, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| WILLIAM G. STONE, III , ROB DEUTSCHMAN, ROY H. CHESTNUTT, HOLLY HESS GROOS, MOHAN GYANI, JEFF KARISH, MOLLIE SPILMAN, MICHELLE M. STERLING, AND BARRETT GARRISON, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| DIGITAL TURBINE, INC., | ) ) | |
| Nominal Defendant. | ) | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Taireese Rembert ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Digital Turbine, Inc. ("Digital Turbine" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission

("SEC") filings, press releases published by and regarding Digital Turbine, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Digital Turbine against certain officers and members of the Company's Board for breaches of their fiduciary duties as set forth below.

2.      According to its public filings, Digital Turbine is the leading independent mobile growth platform and levels up the landscape for advertisers, publishers, carriers, and original equipment manufacturers ("OEMs").  By integrating a full ad stack with proprietary technology built into devices by wireless operators and OEMs, Digital Turbine supercharges advertising and monetization.  The Company is headquartered in Austin, Texas, with global offices in New York, Los Angeles, San Francisco, London, Berlin, Singapore, Tel Aviv, and other cities serving top agency, app developer, and advertising markets.

3.      In 2021, Digital Turbine acquired AdColony Holding AS ("AdColony") and Fyber, N.V. ("Fyber"), which substantially grew the scope and size of Digital Turbine's business.

4.      However, due to the transactions, Digital Turbine identified a material weakness in its internal controls over financial reporting regarding the presentation of certain revenue net of license fees and revenue share expense and the classification of certain hosting costs.  As such, Digital Turbine's internal controls over financial reporting and disclosure controls and procedures were not effective as of March 31, 2022.

5.      Digital Turbine is still assessing its internal controls over the AdColony and Fyber transactions and integrating those entities into Digital Turbine's existing operations.  As a result,

the transactions were excluded from Digital Turbine's assessment of internal control over financial reporting as of March 31, 2022.

6.     In the fourth quarter of the fiscal year ended March 31, 2022, Digital Turbine decided that it needed to complete a more complete analysis of revenue accounting for the Company's recently-acquired entities, including AdColony and Fyber.  After such review, Digital Turbine's management decided that the Company acted as an agent, as opposed to a principal, in certain product lines of the recently-acquired entities.  Accordingly, revenue for those product lines should have been reported net of license fees and revenue share expense.

7.     Moreover, Digital Turbine management decided that the presentation and disclosure of certain hosting costs were not conformed to the Company's corporate accounting policy.  Accordingly, certain hosting costs were classified as product development expenses instead of other direct costs of revenue and general and administrative expenses.  Digital Turbine's management decided that the Company's internal controls for business combinations did not include a control adequately designed to ensure that acquiree accounting policies, as they relate to presentation and classification, were conformed to those of Digital Turbine and generally accepted accounting principles ("GAAP").

8.     On May 17, 2022, Digital Turbine announced that it would be restating its financial statements for: (i) the three-month period ended June 30, 2021; (ii) the three- and six-month periods ended September 30, 2021; and (iii) the three- and nine-month periods ended December 31, 2021.  The restatements were because of an error in the presentation of revenue for certain product lines, and the classification of certain hosting costs for Digital Turbine's acquisitions of AdColony and Fyber.  Following the transactions, Digital Turbine originally assessed the accounting policies of the acquisitions and determined that Digital Turbine acted as a principal in

the revenue arrangements.  As such, revenue was reported gross, exclusive of license fees and revenue share expense.

9.      Digital Turbine has a history of failing to maintain internal controls over financial reporting, which is the Individual Defendants' responsibility.  For example, in 2019, the SEC charged Digital Turbine with violating federal securities laws in connection with Digital Turbine's failure to have and implement effective internal controls over financial reporting for seven consecutive annual reporting periods -- from fiscal years 2011 through 2017.  The SEC found that Digital Turbine reported material weaknesses for years.  Moreover, the SEC noted Digital Turbine's delay in fixing the material weaknesses, which did not occur fully until the end of fiscal year 2018.  Accordingly, the SEC found that Digital Turbine violated federal securities laws and had to pay a civil penalty of $100,000 to the SEC.  The Company directors who failed to review and evaluate the major risks facing Digital Turbine during this time period are a majority of the current Board.

10.     The Individual Defendants approved and allowed Digital Turbine to issue various SEC filings that failed to disclose material adverse facts about Digital Turbine's business, operations, and prospects.  Among other things, the Individual Defendants failed to disclose that: (i) AdColony and Fyber act as agents in certain of their respective product lines; (ii) as a result, revenues for those product lines must be reported net of license fees and revenue share, instead of on a gross basis; (iii) Digital Turbine's internal controls over financial reporting regarding revenue recognition were deficient; and (iv) accordingly, Digital Turbine's net revenues were overstated throughout fiscal 2022, which made the Individual Defendants' positive statements regarding Digital Turbine's business, operations, and prospects materially misleading.

11.     As a result of the foregoing, securities fraud class actions were filed against the Company and certain of its officers, captioned *Kirshner v. Digital Turbine, Inc*., Case No. 1:22-cv-00731 (W.D. Tex.) and *Robison v. Digital Turbine, Inc.*, Case No. 1:22-cv-00550 (W.D. Tex.) (together, the "Securities Class Action").  The Securities Class Action has exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)) and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

*Plaintiff*

17.     Plaintiff is, and has been at all relevant times, a shareholder of Digital Turbine.

***Nominal Defendant***

18.     Nominal Defendant Digital Turbine is a Delaware corporation with its principal executive offices are located at 110 San Antonio Street, Suite 160, Austin, Texas 78701. Digital Turbine's common stock trades on the NASDAQ under the ticker symbol "APPS."

***Individual Defendants***

19.     Defendant Rob Deutschman ("Deutschman") is Chairman of the Board of the Company. Deutschman is a member of the Audit Committee. For the fiscal year ended March 31, 2021, Deutschman received $234,500 in compensation from the Company. For the fiscal year ended March 31, 2022, Deutschman received $372,000 in compensation from the Company.

20.     Defendant Roy H. Chestnutt ("Chestnutt") is a director of the Company. Chestnutt is a member of the Audit Committee. For the fiscal year ended March 31, 2021, Chestnutt received $150,000 in compensation from the Company. For the fiscal year ended March 31, 2022, Chestnutt received $245,000 in compensation from the Company.

21.     Defendant Barrett Garrison ("Garrison") is Chief Financial Officer ("CFO") and Executive Vice President ("EVP") of the Company. For the fiscal year ended March 31, 2021, Garrison received $1,081,091 in compensation from the Company. For the fiscal year ended March 31, 2022, Garrison received $2,696,562 in compensation from the Company.

22.     Defendant Holly Hess Groos ("Groos") is a director of the Company. Groos is Chair of the Audit Committee. For the fiscal year ended March 31, 2022, Groos received $255,502 in compensation from the Company.

23.     Defendant Mohan Gyani ("Gyani") is a director of the Company. For the fiscal year ended March 31, 2021, Gyani received $154,750 in compensation from the Company. For the fiscal year ended March 31, 2022, Gyani received $249,875 in compensation from the

Company.

24.     Defendant Jeff Karish ("Karish") is a director of the Company.  For the fiscal year ended March 31, 2021, Karish received $151,500 in compensation from the Company.  For the fiscal year ended March 31, 2022, Karish received $247,750 in compensation from the Company.

25.     Defendant Mollie Spilman ("Spilman") is a director of the Company.  For the fiscal year ended March 31, 2022, Spilman received $91,740 in compensation from the Company.

26.     Defendant Michelle M. Sterling ("Sterling") is a director of the Company.  For the fiscal year ended March 31, 2021, Sterling received $145,750 in compensation from the Company.  For the fiscal year ended March 31, 2022, Sterling received $243,125 in compensation from the Company.

27.     Defendant William G. Stone III ("Stone") is a director and Chief Executive Officer ("CEO") of the Company.  For the fiscal year ended March 31, 2021, Stone received $2,297,870 in compensation from the Company.  For the fiscal year ended March 31, 2022, Stone received $7,748,317 in compensation from the Company.

28.     Defendants referenced in paragraphs 19 through 27 are herein referred to as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers and/or directors of Digital Turbine, and because of their ability to control the business and corporate affairs of Digital Turbine, the Individual Defendants owed Digital Turbine and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Digital Turbine in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Digital Turbine and its shareholders.

30.     Each director and officer of the Company owes to Digital Turbine and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Digital Turbine, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of Digital Turbine were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Digital Turbine, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ stock exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial

condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35.     To discharge their duties, the officers and directors of Digital Turbine were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Digital Turbine were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Digital Turbine's own Code of Business and Ethical Conduct;

(b)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Remain informed as to how Digital Turbine conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Digital Turbine and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation

9

to be made of, said reports and records;

        (e)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Digital Turbine's operations would comply with all applicable laws and Digital Turbine's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

        (f)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

        (g)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

        (h)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

        36.    Each of the Individual Defendants further owed to Digital Turbine and the shareholders the duty of loyalty requiring that each favor Digital Turbine's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

        37.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Digital Turbine and were at all times acting within the course and scope of such agency.

        38.    Because of their advisory, executive, managerial, and directorial positions with Digital Turbine, each of the Individual Defendants had access to adverse, non-public information about the Company.

39.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Digital Turbine.

## DIGITAL TURBINE'S CODE OF BUSINESS AND ETHICAL CONDUCT

40.     Digital Turbine's Code of Business and Ethical Conduct provides:

The officers, directors and employees of Digital Turbine, Inc. (the "Company") hold an important role in corporate governance. They are uniquely empowered to ensure that stockholders' interests are appropriately balanced, protected and preserved.

Accordingly, this Code of Business and Ethical Conduct (the "Code") provides principles to which these officers, directors and employees are expected to adhere and advocate. The Code embodies rules regarding individual and peer responsibilities, as well as responsibilities to the Company, the public and other stakeholders.

Thus, to the best of their knowledge and ability, they must adhere to and advocate the following principles and responsibilities governing their professional and ethical conduct:

1. They must always promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest in personal and professional relationships.

2. They must not use their position for personal gain such as by soliciting or accepting for personal benefit business opportunities that might otherwise accrue to the benefit of the Company.

3. They must provide the Securities and Exchange Commission, the public and other constituents with reports, documents and information that is full, fair, accurate, complete, objective, relevant, timely and understandable.

4. They must comply with applicable rules and regulations of federal, state, provincial, local and foreign governments, and other appropriate private and public regulatory agencies.

5. They must act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing their independent judgment to be subordinated.

6. They must respect the confidentiality of information acquired in the course of their work, except when authorized or otherwise legally obligated to disclose the

information.

7. They should proactively promote ethical behavior as a responsible partner among peers in their work environment and community.

8. They must responsibly use and control all assets and resources employed or entrusted to them.

9. They must, before creating online content and social media content, consider the potential impact their actions, personal statements or expressions of their personal opinions or beliefs can have on the business, operations and reputation of the Company. They are solely responsible for what they generate or post online, including via social media. Any of their conduct that adversely affects their job performance, the performance of fellow employees or contractors, or otherwise adversely affects stockholders, directors, employees, customers, vendors, or other Company stakeholders or the Company's business, operations, reputation or legitimate business interests may result in disciplinary action up to and including termination or removal. . . .

10. They must act in a manner consistent with the Company's culture, workforce initiatives, and hostile-free work environment.

11. They must not take any action to fraudulently influence, coerce, manipulate, or mislead any auditor engaged in the performance of an audit for the purpose of rendering the financial statements materially misleading.

12. They must promptly report Code violations and suspected illegal, unethical or otherwise dishonest activities to the Chief Executive Officer and Chairman of the Board. The Chief Executive Officer and Chairman of the Board must promptly investigate all such reports. Persons making such reports shall not be retaliated against for doing so. The Chief Executive Officer and Chairman of the Board shall present the results of their investigation to the Board of Directors. If the alleged violation was committed by an officer of the Company, they shall also report the results of their investigation to the Audit Committee of the Board of Directors at its next meeting. The Chief Executive Officer and the Audit Committee shall each be empowered to take merited punitive or corrective action, which may include termination of employment. . . .

## DIGITAL TURBINE'S AUDIT COMMITTEE CHARTER

41.    Digital Turbine's Audit Committee has an Audit Committee Charter, which

provides:

The primary function of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of Digital Turbine, Inc. (the "Company") in fulfilling its oversight responsibilities by reviewing the financial information which

will be provided to the stockholders and others, the systems of internal controls which management and the Board have established, and the Company's audit and financial reporting process.

The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged (including resolution of disagreements between management and the auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and each such registered public accounting firm shall report directly to the Committee.

The Committee shall primarily fulfill these responsibilities by carrying out the activities enumerated in Section V of this Charter.

42.     The Audit Committee Charter provides as follows regarding the Audit Committee's

responsibilities and duties:

To fulfill its responsibilities and duties the Committee shall:

General

• Review the Company's annual and quarterly financial statements and any other relevant reports or other financial information.

• Review the regular internal financial reports prepared by management.

• Select the independent accountants and approve the fees and other compensation to be paid to the independent accountants.

• Pre-approve all audit and permitted non-audit services to be performed by the independent accountants.

• Review and ensure the independence of the independent accountants. This review shall cover and include services, fees, quality control procedures and a formal written statement from the independent auditors regarding relationships between the independent auditors and the Company, consistent with applicable requirement of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence.

• Review the performance of the independent accountants and discharge the independent accountants if and when circumstances warrant.

• Following completion of the annual audit, review separately with the independent accountants and management any problems or difficulties encountered during the course of the audit.

• Establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters.

• Establish procedures for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

Oversight of Annual Audit and Quarterly Reviews

• Review with management and the Company's independent auditors the following information, which is required to be reported by the independent auditor:

o all critical accounting policies and practices to be used;

o all alternative treatments of financial information that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors;

o all other material written communications between the independent auditors and management, such as any management letter and any schedule of unadjusted differences; and

o any material financial arrangements of the Company which do not appear on the financial statements of the Company.

• Resolve all disagreements between the Company's independent auditors and management regarding financial reporting.

Oversight of Financial Reporting Process and Internal Controls

• Review:

o the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, through inquiry and discussions with the Company's independent auditors and management; and

o the yearly report prepared by management, and attested to by the Company's independent auditors, assessing the effectiveness of the Company's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Company's Annual Report on Form 10-K.

• Review with the chief executive officer, chief financial officer and independent auditors, periodically, the following:

o all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

o any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

• Review and discuss with the independent auditors the results of the year-end audit of the Company, including any comments or recommendations of the Company's independent auditors and, based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Company's financial statements should be included in the Company's Annual Report on Form 10-K.

• Review the type and presentation of information to be included in the Company's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Company to analysts and rating agencies (which review may be done generally (i.e., discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance).

Miscellaneous

• Establish and implement policies and procedures for the Committee's review and approval or disapproval of proposed transactions or courses of dealings with respect to which executive officers or directors or members of their immediate families have an interest (including all transactions required to be disclosed by Item 404(a) of Regulation S-K) on an on-going basis.

• Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

• Review the Company's program to monitor compliance with the Company's Code of Business and Ethical Conduct, and meet periodically with management to discuss compliance with the Code of Business and Ethical Conduct.

• Review this Charter at least annually and recommend any changes to the Board.

## SUBSTANTIVE ALLEGATIONS

### Background

43.    Digital Turbine is the leading independent mobile growth platform and levels up the landscape for advertisers, publishers, carriers, and OEMs.  By integrating a full ad stack with proprietary technology built into devices by wireless operators and OEMs, Digital Turbine supercharges advertising and monetization.  The Company is headquartered in Austin, Texas, with global offices in New York, Los Angeles, San Francisco, London, Berlin, Singapore, Tel Aviv, and other cities serving top agency, app developer and advertising markets.

44.    In 2019, the SEC charged Digital Turbine with violating federal securities laws in connection with Digital Turbine's failure to have and implement effective internal controls over financial reporting for seven consecutive annual reporting periods -- from fiscal years 2011 through 2017.

45.    Digital Turbine's material weaknesses resulted from, *inter alia*: (i) deficiencies in the design and operation of controls related to the Company's financial close and reporting process, including weaknesses surrounding the review and performance of reconciliations during the close process; and (ii) failures to maintain sufficient qualified personnel or adequate accounting information technology systems resulting in a manual close with insufficient documentation of the procedures employed.

46.    The SEC found that Digital Turbine reported material weaknesses for years. Moreover, the SEC took note of Digital Turbine's delay in fixing its material weaknesses after the SEC contacted the Company.  Remediation at Digital Turbine did not occur fully until the end of fiscal year 2018.  Accordingly, the SEC found that Digital Turbine violated the general statutory requirement to maintain sufficient internal accounting controls, Exchange Act Section 13(b)(2)(B), as well as the specific regulatory requirement to maintain internal control over financial reporting,

Rule 13a-15(a).

47.     In 2019, Digital Turbine was required to pay a civil penalty of $100,000 to the SEC, and the SEC instituted cease-and-desist proceedings against Digital Turbine pursuant to Section 21C of the Exchange Act.

*False and Misleading Statements*

48.     On August 9, 2021, the Company issued a press release announcing its financial results for the first quarter of 2022, which provided:

Recent Financial Highlights:

Fiscal first quarter of 2022 revenue totaled $212.6 million. On a pro forma basis, as if both Fyber and AdColony were owned for the full quarter, total consolidated pro forma revenue for the fiscal first quarter of 2022 was $292.0 million, representing a 104% increase year-over-year as compared to the comparable pro forma figure for the fiscal first quarter of 2021. . . .

Fiscal 2022 First Quarter Financial Results

Total revenue for the first quarter of fiscal 2022 was $212.6 million. Total "On-Device Media" revenue, which represents revenue derived from the Company's Application Media and Content Media platform products, increased 93% year-over-year to $120.3 million. Total "In-App Media" revenue, which represents revenue derived from the AdColony and Fyber businesses beginning on the dates when the acquisitions closed during the quarter, was $92.3 million. AdColony contributed $44.9 million during the quarter, while Fyber contributed $49.6 million during the quarter. On a pro forma basis, as if both Fyber and AdColony were owned for the full quarter, total consolidated pro forma revenue for the fiscal first quarter of 2022 was $292.0 million, representing a 104% increase year-over-year as compared to the comparable pro forma figure for the fiscal first quarter of 2021.

49.     Also on August 9, 2021, the Company filed a Form 10-Q with the SEC for the period ended June 30, 2021, which confirmed the financial results.  The Form 10-Q also provided:

Net revenues increased by 264.3% ($155,949) over the comparative periods due to a combination of continuing organic growth of the Company's historical legacy business (On Device Media) and contributions from recent acquisitions.

Costs of revenues and operating expenses increased by 299.8% ($145,634) over the comparative periods, a result of continuing organic and inorganic growth, including

the acquisitions of Appreciate, AdColony, and Fyber.

License fees and revenue share increased by 328.3% ($106,048) over the comparative periods, attributable to the increase in net revenues over the same period as these costs are paid as a percentage of our revenues. License fees and revenue share increased at a greater rate over the comparative periods than the associated revenues to which they are tied due to our acquisitions having higher contractual revenue share percentages than the legacy business.

50.     The Form 10-Q provided: "[T]here have been no significant changes to the Company's revenue recognition policies, now inclusive of the acquisitions of AdColony and Fyber."  The Form 10-Q also provided: "Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective."

51.     On November 2, 2021, the Company issued a press release announcing its financial results for the second quarter of 2022, which provided:

Recent Financial Highlights:

Fiscal second quarter of 2022 revenue totaled $310.2 million, representing a 338% increase year-over-year on an as-reported basis and a 63% increase year-over-year as compared to the comparable pro forma figure for the fiscal second quarter of 2021.

Fiscal 2022 Second Quarter Financial Results

Total revenue for the second quarter of fiscal 2022 was $310.2 million. Total "On-Device Media" revenue, which represents revenue derived from the Company's Application Media and Content Media platform products, increased 73% year-over-year to $129.4 million. Before intercompany eliminations, total "In-App Media" revenue, which represents revenue derived from the Fyber and AdColony businesses, increased 61% year-over-year on a pro forma basis to $187.2 million. Fyber contributed $125.7 million during the quarter, while AdColony contributed $61.5 million during the quarter.

52.    Also on November 2, 2021, the Company filed a Form 10-Q with the SEC for the period ended September 30, 2021, which confirmed the financial results.  The Form 10-Q further provided:

> Over the three-month comparative periods, net revenues increased by 337.6% ($239,312), and over the six-month comparative periods, net revenues increased by 302.5% ($392,915). The changes are due to a combination of continuing organic growth of the Company's historical legacy business (now the On Device Media segment) and contributions from recent acquisitions. . . .

> Over the three and six months ended September 30, 2021, total costs of revenues and operating expenses increased by $234,896 and $379,976, respectively, compared to the three and six months ended September 30, 2020. The increase in total costs of revenues was a result of continuing organic growth and the acquisitions of Appreciate, AdColony, and Fyber. . . .

> License fees and revenue share increased by $172,613 to $213,145 in the three months ended September 30, 2021, and were 68.7% as a percentage of total net revenues compared to $40,532 or 57.2% of total net revenues in the three months ended September 30, 2020. . . .

> The increase in license fees and revenue share was attributable to the increase in total net revenues over the same period as these costs are paid as a percentage of our revenues. The increase in license fees and revenue share as a percentage of total net revenues was primarily due to our recent acquisitions having higher license fees and revenue cost percentages, which is largely due to contractual revenue share percentages that are higher than the legacy business.

53.    The Form 10-Q provided: "[T]here have been no significant changes to the Company's revenue recognition policies, now inclusive of the acquisitions of AdColony and Fyber."  The Form 10-Q also provided: "Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective."

54.    On February 8, 2022, the Company issued a press release announcing the Company's financial results for the third quarter of 2022, which provided:

Recent Financial Highlights:

Fiscal third quarter of 2022 revenue totaled $375.5 million, representing a 324% increase year-over-year on an as-reported basis and a 38% increase year-over-year as compared to the comparable pro forma figure for the fiscal third quarter of 2021. . . .

Fiscal 2022 Third Quarter Financial Results

Total revenue for the third quarter of fiscal 2022 was $375.5 million. Total "On-Device Media" revenue, which represents revenue derived from the Company's Application Media and Content Media platform products before intercompany eliminations, increased 43% year-over-year to $133.6 million. Before intercompany eliminations, total revenue from our two "In-App Media" segments, which represents revenue derived from the Fyber and AdColony businesses, increased 40% year-over-year on a pro forma basis to $251.7 million. Fyber contributed $157.4 million during the quarter, while AdColony contributed $94.3 million during the quarter.

55.     Also on February 8, 2022, the Company filed a Form 10-Q with the SEC for the

period ended December 31, 2021, which confirmed the financial results.  The Form 10-Q further

provided:

Over the three-month comparative periods, net revenues increased by 323.8% ($286,894), and over the nine-month comparative periods, net revenues increased by 311.1% ($679,809). The changes are due to a combination of continuing organic growth of the Company's historical legacy business (now the On Device Media segment) and contributions from recent acquisitions. . . .

License fees and revenue share increased by $217,578 to $267,722 in the three months ended December 31, 2021, and was 71.3% as a percentage of total net revenue compared to $50,144, or 56.6% of total net revenue, for the three months ended December 31, 2020. . . .

The increase in license fees and revenue share was attributable to the increase in total net revenue over the same period as these costs are paid as a percentage of our revenue. The increase in license fees and revenue share as a percentage of total net revenue was primarily due to our recent acquisitions having higher license fees and contractual revenue cost percentages compared to the legacy business.

56.     The Form 10-Q provided: "[T]here have been no significant changes to the

Company's revenue recognition policies, now inclusive of the acquisitions of AdColony and

Fyber." The Form 10-Q also provided: "Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective."

57. The above statements were materially false and/or misleading, as well as failed to disclose material adverse facts about Digital Turbine's business, operations, and prospects. Defendants approved and allowed Digital Turbine to issue the SEC filings, which failed to disclose that: (i) AdColony and Fyber act as agents in certain of their respective product lines; (ii) as such, revenues for those product lines must be reported net of license fees and revenue share, instead of on a gross basis; (iii) Digital Turbine's internal controls over financial reporting as to revenue recognition were deficient; and (iv) accordingly, Digital Turbine's net revenues were overstated throughout fiscal year 2022, and the Individual Defendants' positive statements about Digital Turbine's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

***The Truth Emerges***

58. On May 17, 2022, the Company issued a press release announcing that it would be restating its financial statements for the periods ended June 30, 2021, September 30, 2021, and December 31, 2021. The press release provided:

> The revenue for certain product lines of the recently acquired businesses, which are separate reportable segments, will now be reported net of license fees and revenue share, rather than on a gross basis, as had been previously reported. The changes have the offsetting effect of decreasing both revenue and license fees and revenue share in a like amount, while simultaneously increasing reported gross profit margin and Non-GAAP Adjusted EBITDA margin, in the interim financial statements for each relevant period.

59.    Also on May 17, 2022, the Company filed a Form 8-K with the SEC, which

provided preliminary estimates regarding the restatements.  The Form 8-K provided:

> Accordingly, May 11, 2022, the management and the Audit Committee of the
> Board of Directors (the "Audit Committee") of the Company concluded that (a) the
> Company will restate its financial statements for the three-month period ended June
> 30, 2021,three and six-month periods ended September 30, 2021, and three and six-
> month periods ended December 31, 2021 (the "Relevant Periods"), and (b) the
> Company's previously issued unaudited interim consolidated financial statements
> for the Relevant Periods included in its quarterly report on Form 10-Q for each of
> the Relevant Periods, as originally filed with the Securities and Exchange
> Commission on August 9, 2021, November 2, 2021, and February 8, 2022,
> respectively, should no longer be relied upon.
>
> In connection with the integration of the Company's recently acquired businesses
> (AdColony Holding AS and Fyber N.V. (the "Acquired Companies")),
> management performed a review of the presentation of revenues and license fees
> and revenue share based on the accounting guidance for revenue recognition,
> including considerations of principal and agent (or "gross and net") presentation.
> After a detailed review of the Acquired Companies product lines and related
> contracts with customers and publishers, the Company concluded that each
> Acquired Company acts as an agent in certain of their respective product lines and,
> as a result, the revenues for those product lines should be reported net of license
> fees and revenue share. Previously, all revenues of the Acquired Companies, which
> are reported as separate segments referred to as In App Media – AdColony and In
> App Media – Fyber, respectively, were reported on a gross basis.
>
> Previously, the Company's revenues were reported as approximately $212.6
> million for the three-month period ended June 30, 2021, $310.2 million for the
> three-month period ended September 30, 2021, and $375.5 million for the three-
> month period ended December 31, 2021. Based on its preliminary assessment, the
> Company expects that revenue on a net basis will be reported as approximately
> $158.1 million for the three-month period ended June 30, 2021, $188.6 million for
> the three-month period ended September 30, 2021, and $216.8 million for the three-
> month period ended December 31, 2021.

60.    The Form 8-K further provided that "the Company's disclosure controls and

procedures were not effective at June 30, 2021, September 30, 2021, and December 31, 2021."

61.    Following this news, Digital Turbine's shares fell 7.1%, to close at $25.28 per share

on May 18, 2022.

62.     On May 27, 2022, Digital Turbine filed three amended Form 10-Qs with the SEC for the periods ended June 30, 2021, September 30, 2021, and December 31, 2021.  The amended Form 10-Qs confirmed the errors and ineffectiveness of disclosure controls at Digital Turbine, and provided an additional admission with respect to the ineffectiveness of internal controls regarding accounting:

> [M]anagement determined the presentation and disclosure of certain hosting costs had not been conformed to our corporate accounting policy. As a result, certain hosting costs were classified as product development expenses rather than other direct costs of revenue and general and administrative expenses.
>
> Management concluded the Company's internal control for business combinations did not include a control adequately designed to ensure acquiree accounting policies, as they relate to presentation and classification, were conformed to those of the Company and GAAP.
>
> As a result of the identification of the material weakness described above, management reassessed that the Company's disclosure control and procedures were not effective as of [June 30, 2021, September 30, 2021, and December 31, 2021].

63.     As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its officers.  The Securities Class Action has exposed the Company to massive class-wide liability.

64.     Moreover, during the relevant time period, Individual Defendants Garrison and Stone sold thousands of shares of Digital Turbine while they were in possession of material, non-public information regarding Digital Turbine's business growth.

65.     For example, Individual Defendant Garrison sold 60,939 shares of the Company for proceeds of over $3.26 million while the stock price was artificially inflated and while he was in possession of material, non-public information.  As CFO and EVP of Digital Turbine, Garrison knew the truth regarding: (i) the inadequacies of the Company's internal and external financial reporting regarding revenue recognition; (ii) Digital Turbine's false positive statements regarding

its revenue growth; and (iii) the fact that AdColony and Fyber were acting as agents in certain product lines.  However, Garrison traded on such basis.

66.    Individual Defendant Stone sold a total of 170,580 shares of the Company for over $8.6 million while the stock price was artificially inflated and while he was in possession of material, non-public information.  As CEO of the Company, Stone knew the truth regarding: (i) the inadequacies of the Company's internal and external financial reporting regarding revenue recognition; (ii) Digital Turbine's false positive statements regarding its revenue growth; and (iii) the fact that AdColony and Fyber were acting as agents in certain product lines.  However, Stone traded on such basis.

67.    Additionally, during the relevant time period, the Company implemented an incentive compensation program pursuant to which executive officers would be eligible to receive bonuses based on their performance.

68.    Under their employment agreements, Individual Defendants Garrison and Stone are eligible to receive annual cash incentives based on revenue and earnings goals set by the Company's Compensation Committee.  Accordingly, Garrison received a $312,700 performance bonus and Stone received $737,200.  Furthermore, the Compensation Committee increased Stone's fiscal year 2022 annual cash incentive attainment percentages of base salary from 37.5%, 75%, and 150% to 50%, 100%, and 200%, respectively, and increased Garrison's fiscal year 2022 annual cash incentive attainment percentages of base salary from 25%, 50%, and 100% to 37.5%, 75% and 150%, respectively.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the

breaches of fiduciary duties by the Individual Defendants.

70.    Digital Turbine is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

71.    Plaintiff is a current shareholder of Digital Turbine and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

72.    A pre-suit demand on the Board of Digital Turbine is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Deutschman, Chestnutt, Groos, Gyani, Karish, Sterling, Spilman, and Stone.

73.    Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants.  A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.  As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the current directors of Digital Turbine are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

74.    The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

75.    Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

76.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

77.    Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

78.    Individual Defendant Stone is not disinterested or independent.  Stone is CEO of the Company and he derives substantially all of his compensation from his relationship with the Company.  Thus, Stone is not disinterested or independent.  Moreover, while he was in possession of material non-public information, Stone sold more than 170,000 shares of Digital Turbine for over $8.6 million.  Furthermore, Stone has been named as a defendant in the Securities Class Action.

79.    Individual Defendants Deutschman, Chestnutt, and Groos are not disinterested or independent.  Deutschman, Chestnutt, and Groos are members of the Audit Committee, the purpose of which is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements. Therefore, Deutschman, Chestnutt, and Groos knowingly or recklessly allowed the aforementioned improper statements.

80.    Individual Defendants Gyani, Karish, and Sterling are not disinterested or independent.  Gyani, Karish, and Sterling are members of the Compensation Committee.  The purpose of the Compensation Committee is: "(i) overseeing and, as appropriate, determining the annual salaries and other compensation of the Executive Officers (defined below) of the Company and the Company's general employee compensation and other policies, (ii) providing assistance and recommendations with respect to the compensation policies and practices of the Company, and (iii) assisting with the administration of the Company's compensation plans."  Gyani, Karish, and Sterling consciously disregarded their duties as members of the Compensation Committee by, among other things, improperly assessing or failing to assess the incentive component of executive compensation.

81.    Individual Defendants Deutschman, Gyani, and Sterling are also members of the Governance and Nominating Committee.  The purpose of the Governance and Nominating Committee includes "to oversee the corporate governance policies and procedures of the Company."  Deutschman, Gyani, and Sterling failed to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation.

82.    Accordingly, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

83.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

27

85.     The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

86.     The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

87.     The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Digital Turbine were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

88.     The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Digital Turbine, their control over, and/or receipt and/or modification of Digital Turbine's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Digital Turbine, participated in the fraudulent scheme alleged herein.

89.     As a result of the foregoing, the market price of Digital Turbine common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Digital Turbine common stock in purchasing Digital Turbine common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

90.     In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

91.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

93.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

94.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the

Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

95.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

96.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

97.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal

conduct complained of herein.

99.    Plaintiff on behalf of Digital Turbine has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Digital Turbine.

102.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Digital Turbine that was tied to the performance or artificially inflated valuation of Digital Turbine, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

103.    Plaintiff, as a shareholder and a representative of Digital Turbine, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

104.    Plaintiff on behalf of Digital Turbine has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

105.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It

resulted in continuous, connected, and ongoing harm to the Company.

107.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

108.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

109.    Plaintiff on behalf Digital Turbine has no adequate remedy at law.

## COUNT VI

### Against Individual Defendants Garrison and Stone for
### Breach of Fiduciary Duties and Disgorgement

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Individual Defendants Garrison and Stone were unjustly enriched at the expense of, and to the detriment of, the Company.

112.    Individual Defendants Garrison and Stone had access to non-public information regarding the Company.

113.    Individual Defendants Garrison and Stone are fiduciaries of the Company, possess material, non-public information of the Company, and used that information improperly in selling Company stock because they were motivated, in whole or in part, by the substance of that material, non-public information, and acted with scienter.

114.    Individual Defendants Garrison and Stone profited from their misconduct and their exploitation of material and adverse inside information.

115.    The other defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation or other payments that were unjust in light of defendants' bad faith conduct.

116.    Plaintiff, as the representative of the Company, seeks disgorgement of all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Individual Defendants Garrison and Stone as a result of their wrongful conduct and breaches of their fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 6, 2022

**FEDERMAN & SHERWOOD**

By:    */s/ William B. Federman*
William B. Federman
(TX Bar #00794935)
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com

-and-

212 W. Spring Valley Road
Richardson, TX 75081

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Vincent A. Licata
825 East Gate Blvd., Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

34

## **VERIFICATION**

I, Taireese Rembert, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    9/14/2022                                        _____
                                                                              Taireese Rembert